IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

Portland Division

DAVID C. SMITH,                                    CV 08-1025-MA

       Plaintiff,                              OPINION AND ORDER

v.

MICHAEL ASTRUE,
Commissioner of Social
Security,

       Defendant.

RICHARD A. SLY
1001 S.W. 5th Ave., Suite 310
Portland, OR 97204
(503) 224-0436

LINDA ZISKIN
P.O. Box 2237
Lake Oswego, OR 97035
(503) 889-0472

       Attorneys for Plaintiff

DWIGHT C. HOLTON
United States Attorney
ADRIAN L. BROWN
Assistant United States Attorney
1000 S.W. Third Avenue, Suite 600
Portland, OR  97204-2902
(503) 727-1003

1 - OPINION AND ORDER

WILLY M. LE
Special Assistant United States Attorney
701 Fifth Avenue, Suite 2900 MS/901
Seattle, WA  98104-7075
(206) 615-2680

       Attorneys for Defendant

MARSH, Judge.

     Plaintiff David C. Smith seeks judicial review of the Commissioner's final decision denying his January 11, 2001, application for supplemental security income (SSI) benefits under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-83f.

     Plaintiff alleges he has been disabled since April 1, 1999, because of post-traumatic stress disorder (PTSD), a head injury, and other severe bodily injuries, that cause him physical pain, headaches mental confusion, and anxiety and panic attacks. Plaintiff's claim was denied initially and on reconsideration.

     Plaintiff now seeks an Order from this court reversing the Commissioner's final decision and remanding the case for the payment of benefits.  For the following reasons, I **AFFIRM** the final decision of the Commissioner and **DISMISS** this action.

## PROCEDURAL HISTORY

     On November 21, 2002, the Administrative Law Judge (ALJ) held a hearing, and on January 14, 2003, issued a decision in which he found plaintiff was not disabled.

Plaintiff appealed that decision to the Appeals Council, which, on December 2, 2003, remanded the claim and ordered the ALJ (1) to update treatment records concerning plaintiff's depression, anxiety, and personality disorders, and if necessary, order a consultative mental status examination with psychological testing and obtain medical opinions about what the plaintiff was able to do despite his impairments; (2) to reevaluate plaintiff's subjective complaints; (3) to reevaluate plaintiff's mental impairments, including plaintiff's alcohol abuse and his periods of sobriety during the period at issue; (4) if necessary, to obtain evidence from a medical expert to clarify the nature and severity of plaintiff's impairments; and (5) if necessary, to obtain further evidence from a vocational expert for the purpose of clarifying the effect of any assessed limitations on plaintiff's occupational base, including asking hypothetical questions of the vocational expert that include specific limitations as to plaintiff's functional capacity.

On remand, the same ALJ held a second hearing and on July 30, 2004, again found plaintiff was not disabled. Plaintiff appealed that decision to the Appeals Council, and on May 20, 2005, the Appeals Council denied review, making the ALJ's July 30, 2004, decision the final decision of the Commissioner for purposes of judicial review.

Plaintiff appealed that decision to this court.  The Commissioner moved the court for another remand for further proceedings to correct numerous errors made by the ALJ. Plaintiff objected and sought remand for the immediate payment of benefits.  On September 29, 2006, United States District Judge Michael W. Mosman remanded the matter for further proceedings.

In light of the court's remand order, on October 23, 2006, the Appeals Council ordered the ALJ on remand to issue a new decision as to plaintiff's January 11, 2001, original application for SSI benefits, after consolidating that application with a subsequent "duplicate" application for SSI benefits that plaintiff filed on March 31, 2005.[1]

On April 3, 2007, a second ALJ held a hearing in which he incorporated plaintiff's March 31, 2005, application.  On April 18, 2007, the ALJ found plaintiff was not disabled.  Plaintiff appealed that decision to the Appeals Council, and on June 11, 2007, the Appeals Council declined further review, thereby rendering the ALJ's April 18, 2007, decision the final decision

---

[1] The ALJ identified this application as being dated March 21, 2005.  The court concludes the different dates are not material.  The court also notes the application is not included in the record on review.  Nevertheless, as set forth in the court's Opinion and Order, it is clear the ALJ considered all of plaintiff's relevant evidence applicable to his original application as well as relevant evidence produced after his March 2005 application.

of the Commissioner for purposes of judicial review.

On November 19, 2007, plaintiff's counsel submitted a letter to the Appeals Council asserting "Exceptions" to the Appeals Council's decision to decline further review.

On July 24, 2008, the Appeals Council notified plaintiff's counsel that plaintiff's Exceptions were not permitted and the Appeals Council would take no action on them.

### THE ALJ'S FINDINGS

The Commissioner has developed a five-step sequential inquiry to determine whether a claimant is disabled.  Bowen v. Yuckert, 482 U.S.137, 140 (1987).  See also 20 C.F.R. § 416.920. Plaintiff bears the burden of proof at Steps One through Four. See Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999).  Each step is potentially dispositive.

Following consideration of the additional evidence on remand, the ALJ found as follows:

At Step One, plaintiff has not engaged in substantial gainful activity since the alleged onset of his disability on April 1, 1999.

At Step Two, the ALJ found plaintiff suffers from severe impairments relating to PTSD, depression, and back pain.  He has non-severe impairments relating to a "cognitive disorder versus borderline intellectual functioning" and "liver damage and other bodily injuries."  20 C.F.R. §404.1520(d)(a severe impairment or

5  - OPINION AND ORDER

combination of impairments significantly limits an individual's physical or mental ability to do basic work activities).

At Step Three, the ALJ found plaintiff's impairments, when considered singly or in combination, do not meet or equal listed impairments but may cause some limitations in workplace functioning that "do not necessarily preclude him from all work."

Accordingly, the ALJ found plaintiff has the residual functional capacity for light exertion, in which he would be able to lift and carry 10 lbs frequently and 20 lbs occasionally, sit, stand, or walk for up to six hours in an eight-hour workday if he had normal breaks, and push/pull in his upper and lower extremities on an unlimited basis up to the weight described above.  Plaintiff also would be able to climb stairs and ramps, bend, kneel,  balance, crouch, and crawl on a frequent basis, but should only occasionally stoop.

The ALJ also found Plaintiff's non-exertional limitations are related primarily to past drug abuse and include mild-to-moderate intolerance to stress and anxiety.  He is, however, capable of performing simple, routine type work if he worked alone with only brief and structured public interaction.

At Step Four, the ALJ found plaintiff has no past relevant work history.

At Step Five, the ALJ found that, in the light of the above limitations, plaintiff is able to perform other jobs involving unskilled light work that exist in significant numbers in the national economy, including the representative jobs of small products assembly and packaging line worker.

Consistent with the above findings, the ALJ found plaintiff is not disabled and again denied his claim for SSI benefits.

## LEGAL STANDARDS

The initial burden of proof rests on the claimant to establish disability.  Roberts v. Shalala, 66 F.3d 179, 182 (9th Cir. 1995), cert. denied, 517 U.S. 1122 (1996).  To meet this burden, the claimant must demonstrate the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C § 423(d)(1)(A).

The Commissioner's decision must be affirmed if the proper legal standards were applied and the findings are supported by substantial evidence in the record.  42 U.S.C. § 405(g).  Substantial evidence is "more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995).

The court must weigh all of the evidence whether it supports or detracts from the Commissioner's decision. <u>Martinez v. Heckler</u>, 807 F.2d 771, 772 (9th Cir. 1986). The Commissioner's decision must be upheld, however, even if the "evidence is susceptible to more than one rational interpretation." <u>Andrews</u>, 53 F.3d at 1039-40.

The Commissioner bears the burden of developing the record. <u>DeLorme v. Sullivan</u>, 924 F.2d 841, 849 (9th Cir. 1991). The duty to further develop the record, however, is triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence. <u>Mayes v. Massanari</u>, 276 F.3d 453, 459-60 (9th Cir. 2001).

The decision whether to remand for further proceedings or for immediate payment of benefits is within the discretion of the court. <u>Harman v. Apfel</u>, 211 F.3d 1172, 1178 (9th Cir.), <u>cert</u>. <u>denied</u>, 121 S. Ct. 628 (2000). "If additional proceedings can remedy defects in the original administrative proceeding, a social security case should be remanded." <u>Lewin v. Schweiker</u>, 654 F.2d 631, 635 (9th Cir. 1981).

## **<u>ISSUES ON REVIEW</u>**

The issues are whether the ALJ erred by failing (1) to comply with the court's Order on Remand and the Appeals Council's subsequent Order responding to the court's order; (2) to give

clear and convincing reasons for rejecting the opinions of some of plaintiff's treating and examining physicians; and (3) to give clear and convincing reasons for his "attacks" on plaintiff's credibility.

<u>**PLAINTIFF'S TESTIMONY/EVIDENCE**</u>

The following is a compilation of plaintiff's relevant testimony in each of the hearings at which he testified, and information he has provided in his applications for SIS benefits. <u>November 2002 Hearing</u>.

On April 3, 2007, the date of the final hearing on remand, plaintiff was 37 years old. He has a High School GED and has never engaged in any work that would amount to substantial gainful activity. He briefly attended a community college but did not complete any courses.

Plaintiff was assaulted in April 1999 and again July 2001. He has a vertical scar from the upper part of his chest to the bottom of his stomach caused by exploratory surgery occasioned by the first assault in which his colon was damaged and his spleen was removed. He has scarring on his back resulting from a stab wound he received during the second assault.

Plaintiff has cramps during bowel movements and pain in his mid-section and lower back that occurs "off and on" during the day. He is able to carry five-ten pounds on a repetitive basis.

Plaintiff recently learned he has a hernia and he avoids lifting heavy objects that might make it worse. He is not able to sit for an extended period of time.

Plaintiff has not worked since the beatings in 1999 and 2001 because of stress that causes him to have panic attacks and fear that he will become confused and not be able to perform a job properly. His stress extends to everyday functions such as taking showers or doing laundry.

Plaintiff receives therapy to cope with his stress and anxiety on a regular basis.

Plaintiff concedes he had a minimal work record in the years before the first beating. Plaintiff believes his stress has increased since the beatings but he believes therapy has helped him to understand he has always had stress issues.

Plaintiff last used alcohol 18 months to two years before the 2002 hearing. When he told his therapist that he was so anxious he might relapse and resume drinking, the therapist recommended Alcoholics Anonymous.

Plaintiff does not do much during the day, but he sometimes goes for walks on the beach.

At the time of the second hearing, Plaintiff was living with his friend Sandra, and her mother. Either Sandra or her mother would prepare the meals.

April 2004 Hearing.

In the past several months plaintiff has been examined at Oregon Health Sciences University (OHSU) for a hernia. He declined surgery to treat the problem.

Plaintiff has back pain of a different kind than what he had before.  He needs but cannot pay for chiropractic treatments.

Plaintiff is being treated by Dr. Norris, a family practitioner, who prescribes medication to treat plaintiff's psychological problems.  He is not receiving psychiatric care or counseling.  He has episodes of uncontrollable rage when he is alone or with friends and has panic attacks in public.  The episodes occur more often when he is not taking his prescribed medications.

Sandra no longer lives with him because she is unwilling to put up with his yelling, screaming, and banging on walls.  He has been living with another friend, Francesca Copp, for four-five months.

Plaintiff's daily activities include laying down, sleeping, watching television, and occasional shopping.  He stopped using alcohol, marijuana, and other substances in 2004 but his psychological condition has not improved.

Plaintiff remains on probation arising from a 1999 DUII conviction.  He is subject to but has not undergone any random

11 - OPINION AND ORDER

urinalysis tests.  He is not undergoing drug or alcohol treatment and he does not participate in Alcoholics Anonymous or Narcotics Anonymous.

Since he stopped using alcohol, his violent outbursts have increased and are uncontrollable.  He has been treated on one occasion at an Emergency Room after he banged his head against a wall during a panic attack.

April 2007, Hearing.

Plaintiff continues to live on and off with Francesca, who is now his fiancee and the mother of his two-year old daughter. He tries to babysit when his pain is not too bad.

Plaintiff has not worked since the hearing in 2004.  His highest earnings year was 1994 when he earned $505 working as an automobile detailer.  He was fired from that job because of outbursts arising from his panic disorder.

Plaintiff began having back pain when he hurt his back lifting weights in high school.  Since then he has occasionally lifted weights at Bally's Gym, during which he is able to bench press 45 lbs.  He has not been able to lift that amount of weight, however, in the past 9-12 months.  He also injured his thigh doing leg presses in 2005.  He sometimes rides a stationary bicycle set at no resistance for 10-15 minutes.

Plaintiff received financial assistance from his mother before she died, and now receives some help from friends.

12 - OPINION AND ORDER

Plaintiff acknowledges he has occasionally altered items in his medical records by adding words to reflect, in his opinion, what his condition actually is rather than how it is described in his medical records. His goal in doing so is to try to educate those people who needed to make a decision "to help" him.

Plaintiff has a mesh in his stomach from the repair of his hernia. He wants it removed because it hurts, even though his doctors have told him they can find no problem with the mesh that would cause pain.

Plaintiff described being pistol-whipped in 1999 and stabbed in the back in 2001. He was intoxicated on both occasions. His knife wounds were surgically treated. There was no indication at the time of nerve damage or other injury in his back. Plaintiff now has pain in the area of the scars.

When plaintiff occasionally drives an automobile, he is nervous and scared. He denies he is nervous only because he should not be driving at all because he does not have a valid driver's licence. He feels safe only when he is at home, away from the public. He has been sober since about 2003.

### MEDICAL TREATMENT

**Clackamas County Jail**.

In September 1997, plaintiff suffered an injury to the left side of his head following a motor vehicle accident. Three months later, while he was in jail, he was also punched on the

13 - OPINION AND ORDER

left side of his head.  A week later, he reported he had been confused on an intermittent basis since the assault and felt lightheaded.

In September 1998, while he was in jail on a Driving Under the Influence of Intoxicants (DUII) charge, plaintiff denied any history of substance abuse or mental/physical health problems.

In September 2000, plaintiff was again medically screened in jail where he was incarcerated on another DUII charge.  At that time, the medical history he provided highlighted alcohol abuse and his use of antidepressant medication for mental health issues.  Plaintiff indicated he was taking Celexa and Trazadone, which are anti-depressants, and Clonodine.  Plaintiff reported he was assaulted a week earlier and was treated for a cut over his left eyebrow and scalp wound on the left side of his head.

**Oregon Health Sciences University (OHSU).**

In April 1999, plaintiff was allegedly assaulted while intoxicated, resulting in trauma to his abdomen. He had an extensive hematoma with bleeding in his right colon.  Mesh was used to close the abdominal wall.  Plaintiff was discharged 13 days later with instructions to avoid heavy lifting.

In September 1999, plaintiff was treated for a "blunt orbital trauma" around his right eye.

In May 2001, plaintiff was treated for a stab wound in the back.  The wound was treated and he was discharged the next day.

14 - OPINION AND ORDER

In June-July 2001, plaintiff complained of pain in his back and tingling, numbness, and burning in his right thigh.  He was given oxycodone and Vicodin for pain relief.

**Clackamas County Mental Health Center.**

In January 2001, plaintiff was seen for mental health problems.  In a self-evaluation, he described moderate sleep problems, and was "very much" bothered by depression, anxiety, mood swings, intense anger, concentration difficulties, uncontrollable thoughts, and impulsive conduct.  He did poorly relaxing, dealing with his feelings, or accomplishing his goals.  On examination, plaintiff described being assaulted, stated that he prefers to stay at home where he is safe, and he has not worked for almost two years.

The initial diagnoses were post-traumatic stress disorder (PTSD), with problems relating to his social environment, employment, "interaction with the legal system," and other "psychosocial and environmental" problems.  He was assigned a GAF score of 42 (serious difficulty in social, occupational, or school functioning).

In June 2001, plaintiff reported he had been stabbed in the back and receiving treatment at OHSU.  He stated Valium "vastly improved" his anxiety. and he was "objectively" more relaxed and hopeful."  Psychologist Peter Wilson, Psy.D, and psychiatrist

Keith Conant, M.D., jointly wrote a letter "to whom it may concern" that plaintiff suffers from PTSD that is "chronic" and "quite debilitating," which cause panic attacks and depressive symptoms, with associated poor sleep, fatigue, and irritability. Plaintiff had not consistently made his appointments and missed treatment sessions because he was incarcerated.

In July 2001, plaintiff was denied a refill of Valium pending a conference of "all parties involved in his legal affairs and substance abuse treatment." Plaintiff was in a state of "acute anxiety." A week later, plaintiff was again denied a refill of his Valium prescription pending further consultation with other parties.

In September 2001, "after a long absence from the clinic with no contact," plaintiff's case was closed.

Almost three years later, in July 2004, plaintiff sought further assistance but he missed a scheduled appointment because he was "stuck behind the fire lines in Warm Springs."

In August 2004, plaintiff's mental status was "unremarkable" except for "more anxiety."

In September 2004, plaintiff's medication was altered to lower his anxiety level, which had increased to the point that he did not like to leave his home or socialize with others.

Between October 2004 and June 2005, plaintiff attended individual and group therapy sessions. At different times, he

16 - OPINION AND ORDER

reported increased anxiety, suicidal ideation, and difficulty sleeping and on several occasions, he missed his appointments. During this period his mother died, which caused him increased anxiety and panic attacks.

In January 2005, Mental Health Specialist Loren G. Hansen wrote that plaintiff was "in a critical stage of his treatment" because of the recent death of his mother and his fluctuating suicidal ideation, and that, if he lost medical benefits currently provided by the Oregon Health Plan, it "would be an unfortunate and undesirable break in his therapy services."

In March 2005, plaintiff was again assigned a GAF score of 42. In June 2005, plaintiff stated his physical problems were increasing his depression.

**Native American Rehabilitation Health Clinic.**

In January 2000, plaintiff was evaluated for stress, depression, and low self-esteem with a lack of impulse control, relationship conflicts, and other issues relating to chemical dependence. He was diagnosed as suffering from an Adjustment Disorder with depressed mood and anxiety.

In July 2002, plaintiff's anxiety was controlled but he did not trust others and lived a "seclusive existence." He was diagnosed with a cognitive disorder NOS and Polysubstance Dependence, in remission.

17 - OPINION AND ORDER

In August 2005, plaintiff made an unscheduled visit to the Clinic.  The examining physician noted plaintiff had not been to the clinic for three years.  Plaintiff told him he had fired his treatment providers at Clackamas County Mental Health.  He was angry, obstreperous, and exhibited impaired impulse control and speech with "some paranoid ideation," although he was not delusional.  His judgment and insight were significantly impaired.  The examining physician concluded plaintiff was "poorly stable in respect to his cognitive disorder, NOS, complicated by his extensive personality pathology and poly-substance abuse."

**Providence Medical Group - B.J. Scott, M.D., Internal Medicine.**

In March 2005, plaintiff saw Dr. Scott for a complaint of back pain after he reinjured his back in the gym following an injury two months earlier.  He appeared to be in moderate pain. He was prescribed Percocet for pain.

In April 2005, plaintiff continued to complain of pain. Dr. Scott was not "not sure whether his pain is as genuine as he says but he does show significant pain behavior."  Dr. Scott also expressed concern that plaintiff "is going from ER to ER for pain [symptoms]."

Three weeks later, plaintiff was "crying from pain" when he checked in to the clinic and looked uncomfortable and fidgety. He had no back pain, however, on palpation.  Dr. Scott assessed

18 - OPINION AND ORDER

"worsening back pain with new radicular [symptoms]." Dr. Scott, however, also expressed "concern over [the patient's] possible narcotic dependence" although a check with area pharmacies did not show plaintiff was obtaining narcotics from other prescribers.

In May 2005, plaintiff complained of sharp abdominal pains in the region of prior surgery. An examination of the organs within the abdomen and the colon was normal. An MRI did not show any evidence of acute inflammatory disease in the colon. Plaintiff showed symptoms of Grade I (the lowest grade) anterior spondylolisthesis at L5-S1, mild degenerative disc disease at L4-5 and L5-S1 with bulging but no evidence of spinal stenosis and mild foraminal stenosis on the right at L4-5.

Later that month plaintiff had abdominal surgery for hernia repairs. Four days later, he returned to the clinic complaining of severe abdominal pain. He was extremely anxious.

In June 2005, plaintiff continued to have "terrible stomach pain" and complained that he "can't take the back pain, and what is going to be done about that?"

A week later, plaintiff complained of low back pain following an automobile accident. He was diagnosed with lumbar strain.

In September 2005, plaintiff suffered an acute tailbone injury when he slipped and fell.

19 - OPINION AND ORDER

**Oregon City Family Practice Clinic - <u>Jon M. Winjum, M.D.</u>**
**<u>- T. Michael Norris, M.D.</u>**

In November 2003, Dr. Winjum began treating plaintiff.  He urged Clackamas County Social Services Division to provide psychiatric care for plaintiff because of his PTSD diagnosis and severe anxiety that caused him to engage in "self-mutilating behavior."

In March 2004, T. Michael Norris, M.D., wrote that plaintiff's PTSD and generalized anxiety were "worsening to the point of total disability."

In January 2005, he thought plaintiff needed ongoing psychiatric/psychologic therapy and potential hospitalization. He opined that "access to mental health services [for plaintiff] remains critically important."  He opined plaintiff was still "unemployable with his chronic anxieties and his post traumatic stress disorder."

In March 2005, plaintiff complained of right thigh pain after lifting weights and doing leg presses.  X-rays were normal and there was no swelling or bruising.  His range of motion in his hip and knee was normal.  He had an "exquisitely tender" area in the middle of the thigh muscle that was "far out of proportion to what any physical exam can identify."  His "pain threshold [was] unusually low."

In February 2006, Dr. Norris opined that plaintiff's mental capability to perform unskilled or skilled jobs was at best fair, but, for the most part, depending on the nature of the task, he had no such ability, mainly because he was distractable, with poor focus caused by panic attacks.  Dr. Norris also opined that plaintiff would be able to carry less than 10 lbs occasionally, and stand, sit, or walk for only 15 minutes at a time for a total of fours hours in an eight-hour workday because of chronic back pain.  He recommended that Plaintiff never climb ladders and only occasionally climb stairs or crouch.  He should avoid concentrated exposure to extreme cold, heat, humidity, noise, fumes, and hazards (e.g., machinery and heights).

**Diane S. Gudmundsen, D.C. - Chiropractor**.

From July-September 2005, Dr. Gudmundsen treated plaintiff for moderate-severe constant low back pain radiating to the right hip, thigh, and leg.  An MRI in May 2005 revealed a degenerative disc at L3-4 and L4-5, spondylolysthesis, and a moderate right foraminal stenosis at L5-S1 caused by a disc bulge and prominent degenerative facet with mild foraminal stenosis on the right side.  Plaintiff's "response to treatment [w] fair/good" with "substantial improvement both objectively and subjectively." Dr. Gudmundsen opined that "to discontinue treatment at this time" because of a loss of benefits "would result in a worsening of his condition and he would likely need surgery."

21 - OPINION AND ORDER

**LifeWorks N.W. - Mark Owens, MSW - Clinical Social Worker.**

In August 2006, Plaintiff reported his therapy at Clackamas County Mental Health Center was "not so helpful" in treating his panic attacks, anxiety, and depressive symptoms.  Owens assessed PTSD, panic disorder with agoraphobia, and Major Depressive Disorder-moderate and recurrent, with a GAF score of 55.  A plan was made for him to meet 2-4 times per month for individual therapy focusing on symptoms reduction of panic attacks, anxiety symptoms, and depressive symptoms.

**Pain Relief Specialists Northwest P.C.**

From March 2006-January 2007, Plaintiff was seen once or twice a month to obtain pain medications.  His musculoskeletal examination routinely showed normal range of motion.  On each visit, plaintiff described his pain level as averaging 5-7/10 with a high at 9-10/10, although there was some improvement towards the end of his care.

**MENTAL HEALTH EVALUATIONS**

**OHSU - Paul E. Guastadisegni, Ph.D.**

In July 1999, plaintiff underwent a neuropsychological examination to assess for post concussive syndrome arising from an incident when he was thrown down a flight of stairs and repeatedly kicked by several individuals.  He was found to be functioning in the low average to average range of intellect. His working memory and processing speed were borderline.  His

22 - OPINION AND ORDER

capacity to reason, exhibit judgment and think abstractly was low average to average. His capacity for mental flexibility and attention to complex information was extremely low to borderline. He was diagnosed with a general cognitive disorder and adjustment disorder with depressed mood. As a consequence, plaintiff was assessed a GAF score of 55 (moderate difficulty in social, occupational, and school functioning).

**Richard M. Kolbell, Ph.D. - Neuropsychologist.**

In July 2001, Dr. Kolbell performed a neuropsychological evaluation of plaintiff on behalf of Disability Determination Services (DDS). Dr. Kolbell opined plaintiff suffers from PTSD, panic attacks, mild, chronic major depressive disorder, and chronic continuing alcohol abuse, and possible dependent personality disorder. Dr. Kolbell assigned the same GAF score of 55 that was made by OHSU two years earlier.

**Gregory Cole, Ph.D. - Psychologist.**

In December 2003, Dr. Cole performed a psychodianostic evaluation of plaintiff on behalf of DDS. He diagnosed depression, panic disorder without agoraphobia, and dependent personality disorder with the same GAF score of 55. Dr. Cole opined plaintiff could sustain work performing simple routine and multi-step tasks without significant difficulties. He has deficits, however, in attention and concentration and below average abilities in immediate and delayed memory. Dr. Cole also

23 - OPINION AND ORDER

noted, however, plaintiff did not put forth his best effort in those areas.

**Caleb Burns, Ph.D. - Psychologist.**

In August and September 2005, Dr. Burns performed another evaluation with neuropsychological testing of plaintiff on behalf of DDS.  Based on plaintiff's history, a mental status examination, and testing, in which plaintiff appeared to be motivated to do well, Dr. Burns diagnosed plaintiff as suffering from major depression of "moderate proportions," PTSD, and panic disorder with agoraphobia.  He assigned a GAF of 52, which was consistent with the earlier GAF scores and indicates plaintiff would have moderate difficulty in social, occupational, and school functioning.  Dr. Burns also opined "it would be difficult for me to imagine a competitive work situation for plaintiff for at least the next twelve months" because he would be:

> unable to maintain attention and concentration for extended periods of time, will be unable to work in coordination with or in proximity to others without being distracted by them, will be unable to keep a normal work day and work week without interruptions for psychologically-based symptoms and among other things, will find it very difficult to interact appropriately with the general public and to ask simple questions or request assistance.

Dr. Burns presumed that plaintiff was "doomed to failure" if he were placed in a work setting and, "[r]ather than employment, [plaintiff] would benefit better from a day treatment setting."

24 - OPINION AND ORDER

<u>**MEDICAL CONSULTATIONS**</u>

<u>**Mary Ann Westfall, M.D.**</u>
<u>**Richard Alley, M.D.**</u>

In June 2005, Dr. Westfall reviewed plaintiff's medical records and concluded plaintiff has the physical ability to lift 20 lbs occasionally and 10 lbs frequently, stand, walk, and/or sit for six hours in an eight-hour work day, has unlimited pushing and pulling capability, and is able frequently to climb, balance, kneel, crouch, and crawl, and occasionally to stoop. Dr. Alley concurred in this assessment.

<u>**MENTAL HEALTH CONSULTATIONS**</u>

<u>**Dick Wimmers, Ph.D. - Psychologist.**</u>
<u>**Frank Lahman, Ph.D. - Psychologist.**</u>
<u>**Robert Henry, Ph.D. - Psychologist.**</u>
<u>**Bill Henning, Ph.D. - Psychologist.**</u>

In August 2001, Dr. Wimmers reviewed plaintiff's medical records and concluded he suffered from major depression/mild, chronic, PTSD, panic attacks, and chronic alcohol abuse. He opined that plaintiff has mild restrictions in daily living activities, moderate difficulties in maintaining social functioning and maintaining concentration, persistence, and pace, and might have one or two repeated episodes of decompensation for an extended duration.

Dr. Lahman concurred in this assessment, and added that plaintiff is limited to simple 1,2,3, step work, and should have limited public contact.

25 - OPINION AND ORDER

In June 2005, Dr. Henry concluded the medical records support a diagnosis of panic/anxiety/PTSD, and alcohol abuse by history.  Dr. Henry found plaintiff reasonably might be anxious about leaving his home, but he leaves home frequently and, therefore, is not agoraphobic. He opined plaintiff has no restriction in daily living activities, no difficulties maintaining concentration, persistence, or pace, except in working with others, where he will experience moderate difficulties, and he has moderate difficulties in maintaining social functioning.

Dr. Hennings concurred with Dr. Henry's assessment and opined the low GAF scores of 42 assessed by Clackamas County Mental Health and a prior opinion that plaintiff was unemployable "seem a bit excessive" in light of the medical history, the objective evidence in the medical file, and credibility issues.

### DISCUSSION

Plaintiff contends the ALJ erred by failing (1) to comply with the court's Order on Remand and the Appeals Council's subsequent Order responding to the court's order; (2) to give clear and convincing reasons for finding plaintiff is not credible; and (3) to give clear and convincing reasons for rejecting the opinions of some of plaintiff's treating and examining physicians.

1.  **Compliance with Court and Appeals Council Orders on Remand**.

   Plaintiff points out the Appeals Council's remand order
issued in October 2006 in response to Judge Mosman's remand order
required the ALJ to consolidate plaintiff's January 2001 and
March 2005 SSI applications and issue a decision that considered
both applications.  Plaintiff contends the ALJ failed to do so
because his final decision states plaintiff has not been under a
disability "since March 31, 2005."

   The Commissioner contends the ALJ's decision clearly
reflects that, in reaching his non-disability determination, the
ALJ considered all the evidence dating back to at least 1999,
before plaintiff filed his first application.  Accordingly, the
ALJ made a harmless drafting error in asserting that March 2005
was the disability determination date.  I agree.  The ALJ recited
the entire relevant medical record in considerable detail to
support his finding as to the severity of plaintiff's physical
and mental impairments and his ultimate finding that plaintiff
was not disabled.  To the extent the ALJ erred in limiting the
disability determination to March 2005 rather than January 2001,
the error was harmless.  Burch v. Barnhart, 400 F.3d 676, 679
(9th Cir. 2005).

2.  **Plaintiff's Lack of Credibility**.

   Plaintiff's entire argument supporting his contention that
the ALJ erred in failing to credit his testimony regarding the

27 - OPINION AND ORDER

severity of his impairments is stated in one short paragraph:

> The underlying theme throughout this decision
> is the ALJ's palpable dislike and disbelief
> of this claimant.  His attacks on Plaintiff's
> credibility are often without factual
> foundation and do not satisfy the clear
> and convincing standard of <u>Smolen v. Chater</u>,
> 80 F.3d 1273, 1281-82 (9th Cir. 1996).

I disagree.  A claimant who alleges disability based on subjective symptoms "must produce objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged. . . .'" <u>Bunnell v. Sullivan</u>, 947 F.2d 341, 344 (9th Cir. 1991) (quoting 42 U.S.C. § 423(d)(5)(A) (1988)).  <u>See</u> <u>also</u> <u>Cotton v. Bowen</u>, 799 F.2d 1403, 1407-08 (9th Cir. 1986).  The claimant need not produce objective medical evidence of the symptoms or their severity.  <u>Smolen v. Chater</u>, 80 F.3d 1276, 1281-82 (9th Cir. 1996).

   If the claimant produces objective evidence that underlying impairments could cause the pain complained of and there is not any affirmative evidence to suggest the claimant is malingering, the ALJ is required to give clear and convincing reasons for rejecting plaintiff's testimony regarding the severity of his symptoms.  <u>Dodrill v. Shalala</u>, 12 F.3d 915, 918 (9th Cir. 1993). <u>See</u> <u>also</u> <u>Smolen</u>, 80 F.3d at 1283.  To determine whether the claimant's subjective testimony is credible, the ALJ may rely on (1) ordinary techniques of credibility evaluation such as the claimant's reputation for lying, prior inconsistent statements

concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) an unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities. Id. at 1284 (citations omitted).

The ALJ's Findings are replete with examples of plaintiff's lack of trustworthiness: (1) first and foremost, plaintiff has acknowledged that he altered medical records to "educate" the decision-makers regarding his true condition; (2) he has repeatedly made false statements regarding the extent of his sobriety; (3) he has repeatedly engaged in drug seeking behavior; and (4) his pain complaints have been noted to be out of proportion to physical findings.

The court concludes the ALJ's dismissive attitude towards plaintiff's credibility is amply justified and supported in the administrative record.

**3.   Rejection of Medical Evidence.**

**a.  Peter Wilson, Ph.D., and Keith Conant, M.D.,**

Plaintiff contends the ALJ on remand improperly rejected the June 2001 medical evidence and opinions of Clackamas County Mental Health psychologist Peter Wilson, Ph.D., and psychiatrist Keith Conant, M.D., who jointly opined plaintiff's suffers from "chronic" and "quite debilitating" PTSD.

In his remand order, Judge Mosman noted that, in the first decision, the original ALJ did not address these doctors' opinion, and in the second decision following the original remand, the present ALJ did not obtain clarification from Dr. Conant as to what he meant by the terms "chronic" and "quite debilitating." Consequently, Judge Mosman ordered a remand of this matter to the Commissioner, in part, to contact Dr. Conant for the purpose of clarifying what those terms meant as to plaintiff's "ability to work." Tr. 649. The ALJ did not do so. Instead, during the hearing on remand, the ALJ refused a request by plaintiff's counsel that he contact Dr. Conant. In addition, the ALJ rejected plaintiff's motion to allow the record to remain open until plaintiff's counsel had the opportunity to contact Dr. Conant himself to obtain the clarification ordered by Judge Mosman.

The government does not directly address the Commissioner's failure to comply with Judge Mosman's remand order, but instead, argues the ALJ was entitled to reject any medical opinion that was based on plaintiff's subjective complaints because plaintiff is not a credible witness. The government also asserts the Commissioner is not required "to recontact a doctor if the doctor's opinion is wholly unsupported." *See* <u>Bayliss v. Barnhart</u>, 472 F.3d 1211, 1217 (9th Cir. 2005)("An ALJ is required to recontact a doctor only if the doctor's report is ambiguous or insufficient for the ALJ to make a disability determination.").

30 - OPINION AND ORDER

In the usual case, the Commissioner's deliberate failure to comply with a court's previous order on remand, at a minimum, would require a further remand to afford the Commissioner a final opportunity to comply with the court order. This case, however, is extraordinary in that the evidence of plaintiff's lack of credibility has become substantially stronger since Judge Mosman issued his order of remand, in large part because of plaintiff's admitted alteration of his medical records. This court concludes it would be futile to obtain clarification of a doctor's opinion made almost nine years ago, which relied in large part on an untrustworthy patient's subjective complaints.

In reaching this conclusion, the court does not condone the ALJ's cavalier and dismissive attitude regarding the need for the Commissioner to obtain clarification from Dr. Conant [and/or Dr. Wilson] in order to comply with the court's prior remand order. Nevertheless, the court concludes that, based on the record that has been developed since those doctors offered their opinions, the Commissioner's failure to do so is harmless.

**b.   Paul Guastadisegni, Ph.D.**

The Commissioner was also ordered on remand to address Dr. Guastadisegni's opinion, following neuropsychological testing in 1999, that plaintiff's cognitive problems, at that time, coupled with his medical problems, prevented him from working.

The ALJ complied with this part of Judge Mosman's remand order and specifically addressed Dr. Guastadisegni's opinion, noting Dr. Guastadisegni did not address plaintiff's drinking patterns and relied in large part on plaintiff's self-report in diagnosing plaintiff as suffering from a "cognitive disorder NOS" based on a "2nd head injury."  The ALJ also noted Dr. Guastadisegni's comment that plaintiff "was a vague historian" who "had difficulty in describing specific details and seemed somewhat guarded and reluctant to discuss his past" in that "he did want to discuss it."  The ALJ also noted plaintiff gave inconsistent statements to Dr. Guastadisegni regarding the events that led to his head injury.

On this record, the court concludes the ALJ on remand adequately evaluated Dr. Guastadisegni's examination report and his opinion of plaintiff's lack of ability to work and gave clear and convincing reasons for rejecting it.

**c.  Michael Norris, M.D.**

Judge Mosman found the ALJ properly evaluated Dr. Norris's opinion that plaintiff was unable to work by giving it "little weight."  On remand, plaintiff submits additional, albeit sparse chart notes in an effort to bolster Dr. Norris's opinion.  Most of the chart notes pertain to irrelevant medical conditions.  One note reflects plaintiff complained of anxiety and PTSD and

presented Dr. Norris with two long disability claim forms to be filled out and "a large file of old records" to support his claim for SSI benefits.  Another note reflects plaintiff was being treated with Xanax and had "less anxiety than ever before." Plaintiff described the "the severity" of his back and abdominal pain was "improving."

The ALJ addressed plaintiff's additional evidence, noting that Dr. Norris's residual functional capacity assessment and his disability opinion were supported by a "fill-in-the blanks" assessment form, without medical evidence to support the assessments.

The court concludes the ALJ accurately described and adequately assessed the limited value of Dr. Norris's additional medical evidence and medical opinion.

**d.  Caleb Burns, Ph.D.**

After the remand, psychologist Caleb Burns examined plaintiff and concluded any work effort he might make would be "doomed to failure" because of his mental impairments that include PTSD, panic disorder with agoraphobia, and major depression.

The ALJ implicitly rejected Dr. Burns' opinion in part by accepting the opinions of the consulting psychologists despite the "updated record[] of Dr. Burns."  He specifically rejected those opinions of doctors who relied on plaintiff's subjective

33 - OPINION AND ORDER

complaints because of his finding, amply supported by the record,
that plaintiff was not credible.  The ALJ also included in his
residual functional capacity assessment some of the limitations
assessed by Dr. Burns and other health care providers, relating to
plaintiff's ability to maintain persistence,
pace and concentration.

For these reason, the Court concludes the ALJ gave clear and
convincing reasons for accepting some but not all of Dr. Burn's
opinions regarding plaintiff's ability to engage in substantial
gainful activity.

**e. Medication Side Effects.**

Finally, Plaintiff alleges the ALJ ignored the effects of the
side effects of medication, such as daytime sleepiness on
plaintiff's ability to work.  I disagree.  The ALJ specifically
addressed this issue:

> Lastly, the claimant testified, as too did
> his fiancee, that he "is sleeping all day,
> falling asleep at meals, and is generally non-
> functional.  However, while continuing seeking
> continuation of 480 milligrams of OxyContin
> plus Benzodiazepines every day from treating
> and emergency room doctors, the record is
> conspicuously absent of any reported side-
> effects such as daytime somnolence. . . .
>
> [T]he only side-effect reported by the
> claimant to prescribing doctors is that his
> sex drive has been "altered."

Tr. 628.  I find the ALJ's assessment of this issue is supported
by the record as a whole.

34 - OPINION AND ORDER

## CONCLUSION

For these reasons, the Commissioner's final decision denying benefits to plaintiff is **AFFIRMED** and this matter is **DISMISSED** with prejudice.

IT IS SO ORDERED.

DATED this  7 day of April, 2010.


 /s/  Malcolm F. Marsh
MALCOLM F. MARSH
United States District Judge

35 - OPINION AND ORDER